UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 1:24-CR-00178-RBW |
| MATTHEW VALENTIN, and ANDREW VALENTIN | |
| Defendants. | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Matthew Valentin and Andrew Valentin to 57 months' imprisonment (an upward variance for Matthew Valentin and the midpoint of Andrew Valentin's Guidelines range). The government further requests that this Court sentence both Matthew and Andrew Valentin to a three-year term of supervised release, $2,000 in restitution, and a mandatory assessment of $200.

## I.    INTRODUCTION

Matthew Valentin, a 32 year old business owner, and Andrew Valentin, a 27 year old home remodeling expert, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of Congress' certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States

The Valentin brothers stayed on Capitol grounds for hours, committing numerous violent assaults throughout the day. They climbed a media tower on the West Plaza and watched the chaos below. After climbing down, they helped shove a metal barricade into officers who had formed a defensive line on the West Plaza—and, during that chaos, Matthew Valentin reached his hand through the metal barricade and grabbed a Capitol Police Officer on or near the officer's neck. They later moved to the West Terrace where Matthew Valentin again approached officers who had formed a defensive line and tried to tear a baton out of an officer's hands. Hours later, after officers had cleared rioters from the Upper West Terrace, Andrew Valentin threw a chair at a line of officers, striking one officer's protective shield.

The government recommends that the Court sentence Matthew Valentin 57 months' imprisonment for two assault convictions, in violation of 18 U.S.C. § 111(a)(1), and Andrew Valentin to 57 months' imprisonment for two assault convictions, in violation of 18 U.S.C. § 111(a)(1) and 18 U.S.C. § 111(a)(1), (b).

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offenses filed in this case,

---

Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

ECF Nos. 49, 50, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.    The Valentin Brothers's Role in the January 6, 2021 Attack on the Capitol

On January 6, 2021, the Valentins attended a rally by the Ellipse to support the former President. The Valentins then marched down Constitution Avenue to the Capitol. By 2:15 p.m., the Valentins had climbed a media tower on the West Plaza and watched the chaos unfold on the West side of the Capitol. *See*, Exhibit 1 (open-source video showing the West Plaza while the Valentins were on the media tower).



*Image 1: open-source image showing Matthew Valentin (circled in yellow)*
*and Andrew Valentin (circled in red) climbing on the media tower on Capitol grounds.*

From that vantage point, they could see that officers had formed a defensive line on the West Plaza behind a line of metal bike rack barricades.

After climbing down from the media tower, the Valentins made their way toward the police line on the West Plaza. At approximately 2:28 p.m., rioters, including the Valentins, rushed the line. The crowd yelled "push push push" and began to forcibly push the barricades into the line of officers. The Valentins joined the crowd, and threw their full weight into shoving the barricade, ultimately driving officers backward.



*Image 2: Screenshot from Exhibit 2 at 00:24, showing Matthew Valentin (circled in yellow)*
*and Andrew Valentin (circled in red) shoving a metal barricade into officers*

During the violent struggle, Matthew Valentin reached through the barricade's metal bars and grabbed a U.S. Capitol Police Officer by the throat.



*Image 3: Screenshot from Exhibit 3 at 09:12, showing*
*Matthew Valentin (circled in yellow) grabbing a U.S. Capitol Police Officer*



*Image 4: Portion of Image 3 enlarged to show*
*Matthew Valentin (circled in yellow) grabbing a U.S. Capitol Police Officer*

After the rioters rushed the line, police regrouped and formed a new defensive line on the south side of the West Plaza. The Valentins pursued police officers across the West Plaza, and Andrew Valentin climbed a wall and used his phone to record the chaos around him.

5



*Image 5: Screenshot from Exhibit 4 at 1:36, showing*
*Andrew Valentin (circled in red) before approaching the police line*

Matthew Valentin acquired a police baton as he moved south on the West Plaza, and as Andrew Valentin approached the new defensive police line, he bent down to grab another baton from the ground.



*Image 6: Screenshot from Exhibit 5 at 2:39, showing Matthew Valentin (circled in yellow)
confronting the police line and Andrew Valentin (circled in red) retrieving a police baton*

Matthew Valentin yelled at officers and then sprayed a chemical irritant toward officers.



*Image 7: Screenshot from Exhibit 5 at 2:51, showing*
*Matthew Valentin (circled in yellow) spraying a chemical irritant towards officers*

Matthew Valentin momentarily lowered the spray, then raised the canister again, and sprayed a chemical irritant toward officers a second time.



*Image 8: Screenshot from Exhibit 5 at 2:53, showing*
*Matthew Valentin (circled in yellow) spraying a chemical irritant toward officers*

By 2:50 p.m., the Valentins, still carrying their stolen police batons, made their way to the steps

near the Upper West Terrace where they confronted and yelled at another defensive line of officers.



*Image 9: Screenshot from Exhibit 6 at 0:45, showing*
*Andrew Valentin (circled in red) carrying a baton and yelling at officers*



*Image 10: Screenshot from Exhibit 6 at 2:01, showing*
*Andrew Valentin (circled in red) and Matthew Valentin (circled in yellow) yelling at officers*

At approximately 3:30 p.m., a group of rioters, including Matthew Valentin, tried to break

10

through the police line. Matthew Valentin approached the line of officers, grabbed an officer's baton, and tried to rip the baton from the officer's hands.



*Image 11: Screenshot from Exhibit 7 at 0:55, showing*
*Matthew Valentin (circled in yellow) grabbing an officer's baton*



*Image 12: Screenshot from Exhibit 8 at 0:25, showing*
*Matthew Valentin (circled in yellow) grabbing an officer's baton*

After a struggle over the baton lasting approximately 8 seconds, the officer dislodged Matthew Valentin.

At approximately 5:00 p.m., the Valentins relocated to the West Plaza as officers cleared the Upper West Plaza. Officers then descended a set of stairs on the West front and formed a defensive line at the bottom of those stairs. Andrew Valentin picked up a folding chair and hurled it at the line of officers.



*Image 13: Screenshot from Exhibit 9 at 00:50, showing*
*Andrew Valentin (circled in red) hurling a chair at officers*



*Image 14: Screenshot from Exhibit 10 at 25:16 showing Andrew Valentin*
*(circled in red) throwing a folding chair (circled in green) at a line of police officers*



*Image 15: Screenshot from Exhibit 10 at 25:16 showing Andrew Valentin*
*(circled in red) throwing a folding chair (circled in green) at a line of police officers*

The chair struck Montgomery County Police Officer Sgt. P.K.'s shield.

The Valentins approached the line of officers again. Andrew Valentin berated an officer, calling him an "oath breaker." *See,* Exhibit 11, at 5:09-7:30.



*Image 16: Screenshot from Exhibit 11 at 7:08 showing Andrew Valentin
(circled in red) and Matthew Valentin (circled in yellow)*

The Valentin brothers remained near the police line until police were able to clear the area.

## III.    THE CHARGES AND PLEA AGREEMENT

On September 26, 2024, the government filed an information charging Matthew Valentin with two counts of assaulting, resisting, or impeding certain officers, in violation of 18 U.S.C. § 111(a). That same day, Matthew Valentin pled guilty pursuant to a plea agreement.

On September 26, 2024, the government filed an information charging Andrew Valentin with one count of assaulting, resisting, or impeding certain officers, in violation of 18 U.S.C. § 111(a), and one count and assaulting, resisting, or impeding certain officers with a dangerous and

deadly weapon, in violation of 18 U.S.C. § 111(a), (b). That same day, Andrew Valentin pled guilty pursuant to a plea agreement.

## IV.    STATUTORY PENALTIES

Matthew Valentin now faces sentencing on two counts of assaulting, resisting, or impeding certain officers, in violation of 18 U.S.C. § 111(a), and Andrew Valentin now faces sentencing on one count of assaulting, resisting, or impeding certain officers, in violation of 18 U.S.C. § 111(a), and one count and assaulting, resisting, or impeding certain officers with a dangerous and deadly weapon, in violation of 18 U.S.C. § 111(a), (b).

As noted by the plea agreements and the Presentence Report issued by the U.S. Probation Office, Matthew Valentin faces up to eight years of imprisonment, a term of supervised release of not more than three years, and a fine of up to $250,000 on each count of conviction.   Andrew Valentin faces up to eight years of imprisonment, a term of supervised release of not more than three years, and a fine of up to $250,000 on the assault conviction, and up to 20 years of imprisonment, a term of supervised release of not more than three years, and a fine of up to $250,000, on the assault with a dangerous weapon conviction. Both also face restitution and a mandatory special assessment of $200.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

Both PSRs correctly calculate the Guidelines.

*Matthew Valentin*

For Matthew Valentin, the Guidelines are as follows:

Count One: 18 U.S.C. § 111(a)(1)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2[2] | Base Offense Level | 14 |
| U.S.S.G. § 2J1.2(b)(1)(B) | Victim Related Enhancement | +6 |
| | **Total** | **20** |

Count Two: 18 U.S.C. § 111(a)(1)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| | **Total** | **20** |

| | |
|---|---|
| **Combined Offense Level[3]** | **22** |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | -3 |
| **Total Adjusted Offense Level:** | **19** |

The U.S. Probation Office calculated Matthew Valentin's criminal history as category I, which is not disputed. M.V. PSR ¶ 69. Accordingly, based on the Matthew Valentin's total adjusted offense level, after acceptance of responsibility, at 19, Matthew Valentin's Guidelines imprisonment range is 30 to 37 months' imprisonment.

---

[2] By cross-reference from U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), which directs that Section § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault.

[3] Probation's calculations differ from the plea agreement as Probation correctly assessed that 2 units are added to the offense level under U.S.S.G. § 3D1.4, where the plea agreement incorrectly assessed that only 1 unit was added under that provision.

*Andrew Valentin*

For Andrew Valentin, the Guidelines are as follows:

Count One: 18 U.S.C. § 111(a)(1)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2 | Base Offense Level | 14 |
| U.S.S.G. § 2J1.2(b)(1)(B) | Victim Related Enhancement | +6 |
| | **Total** | **20** |

Count Two: 18 U.S.C. § 111(a)(1), (b)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2)(B) | Weapon Enhancement | +4 |
| U.S.S.G. § 2A2.2(b)(7) | Conviction under § 111(a)(1), (b) | +2 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| | **Total** | **26** |

| | |
|---|---|
| **Combined Offense Level** | **27** |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | -3 |
| **Total Adjusted Offense Level:** | **24** |

The U.S. Probation Office calculated Andrew Valentin's criminal history as category I, which is not disputed. A.V. PSR ¶ 70. Accordingly, based on the Andrew Valentin's total adjusted offense level, after acceptance of responsibility, at 24, Andrew Valentin's Guidelines imprisonment range is 51 to 63 months' imprisonment. Andrew Valentin's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained herein.

After determining the defendant's Guidelines range, a court then considers any departures or variances. *See* U.S.S.G. § 1B1.1(a)-(c). Because Matthew Valentin's Guidelines range does not capture the unprecedented and uniquely harmful nature of his conduct on January 6, which included grabbing an officer by the throat and spraying a chemical irritant towards officers, the

government respectfully requests that the Court vary upwards to sentence Matthew Valentin to 57 months of imprisonment or some variance that accounts for the mismatch between Valentin's guidelines, his conduct, and his codefendant's similarly situated conduct. An upward variance is warranted to achieve an appropriate sentence under the § 3553(a) sentencing factors. An upward variance is appropriate when "the defendant's conduct was more harmful or egregious than the typical case represented by the relevant Sentencing Guidelines range." *United States v. Murray*, 897 F.3d 298, 308–09 (D.C. Cir. 2018) (cleaned up). Here, an upward variance is warranted to account for the unique nature and circumstances of the offense and to reflect the seriousness of his conduct, specifically to account for the chemical irritant that he twice sprayed at officers and for going beyond shoving a metal barricade into officers by reaching through the barricade and grabbing an officer's throat. Accordingly, the government requests that the Court vary upwards and sentence Matthew Valentin to 57 months' imprisonment, in order to give effect to "the concerns underlying the Government's requests for these enhancements under the § 3553(a) factors at sentencing." *See United States v. Seefried*, 639 F. Supp. 3d 8, 20 (D.D.C. 2022).

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, the Valentin brothers' felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing

the United States into a Constitutional crisis. The brothers climbed a media tower and watched the chaos around them unfold before committing multiple assaults. They helped break the police line by shoving a metal barricade into officers, and Matthew Valentin violently grabbed an officer's neck. They followed that assault by stealing police batons and berating officers. Matthew Valentin committed two other acts of violence—spraying a chemical irritant towards officers and trying to wrestle a baton from another officer. Andrew Valentin threw a chair at officers, striking one. The nature and circumstances of the Valentins' offenses were of the utmost seriousness, and fully support the government's recommended sentence of 57 months' imprisonment for both brothers.

### B.  The History and Characteristics of the Defendant

Both Andrew and Matthew Valentin reported a loving and stable childhood. Both are gainfully employed and in stable relationships. Their siblings report that they maintain close relationship with their family. These stabilizing family factors did not deter either brother from committing the instant offenses.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Matthew Valentin and Andrew Valentin's criminal conduct on January 6 was the epitome of disrespect for the law.

### D.  The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving

domestic terrorism, which the breach of the Capitol certainly was.[4] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

### Specific Deterrence

Both Andrew and Matthew Valentin engaged in multiple acts of violence over the course of over 3 hours. This was not one isolated event—rather, the brothers took every opportunity to attack, assault, and berate police throughout the course of the day. The need for the sentence to provide specific deterrence to these also weighs heavily in favor of a lengthy term of incarceration.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

---

[4] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision

leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[5] "When an offense is uniquely serious, courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[6] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

To start, the best comparisons before turning to other similarly situated January 6 defendants is that of the two brothers themselves. The Valentin brothers remained together on January 6 and engaged in belligerent and assaultive conduct throughout the day. Both climbed a media tower before climbing down and ramming a metal barricade into a line of officers. Both acquired police batons. Both yelled at officers. Both engaged in additional assaultive conduct. The driving distinction in the Guideline range is the fact that the folding chair that Andrew Valentin

---

[5] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[6] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

hurled at officers is a dangerous weapon. But on balance, Matthew Valentin's conduct is equally as serious—he grabbed an officer's throat as the brothers shoved the barricade into police, sprayed a chemical irritant towards officers twice, and tried to tear a baton from an officer's hands. While the guidelines must factor into the ultimate recommendation, it is impossible to extricate the conduct of two brothers who acted in concert with one another, militating a similar sentence amongst these two defendants.

In *United States v. Bilyard*, 22-cr-34 (RBW), this Court imposed a sentence of 40 months' imprisonment for a defendant who pepper sprayed officers defending the Capitol and used a metal bat to break into and enter a Capitol conference room. The Valentins' conduct warrants a higher sentence. Bilyard committed one assault during his time on Capitol grounds while both Matthew and Andrew Valentin committed multiple assaults throughout their three hours on Capitol grounds. And while Bilyard used a bat to break into a Capitol conference room, the Valentins stole police batons, thus depriving officers of their protective gear.

In *United States v. Leyden*, 22-cr-314 (TNM), the court imposed a sentence of 38 months' imprisonment where the defendant, like the Valentin brothers, pushed a police line back by driving a metal bike rack barricade into the officers, ultimately contributing to scores of other rioters entering the restricted grounds at Peace Circle. Leyden's conduct also caused significant bodily injuries to one officer. The Valentin brothers' conduct was at least as serious as the conduct in *Leyden*. The Valentin brothers' decision to drive a metal barricade into a line of officers resulted in the mob overrunning another police line. Matthew Valentin's conduct was even more egregious, as he grabbed an officer's neck through the rack. Matthew and Andrew Valentin, like Leyden,

24

pushed a metal barricade into a line of police officers, but unlike Leyden, their conduct expanded beyond that to include additional assaults. Accordingly, this Court should impose a higher sentence on the Valentins than the sentence imposed on Leyden.

In *United States v. McGrew*, 21-cr-398 (BAH), the defendant brought bear mace to the Capitol. McGrew first pushed his way to the front of the crowd on the West Plaza and later entered the Capitol through the Upper West Terrace doorway. Prior to entering, McGrew encouraged other rioters, by repeatedly yelling, "Let's Go!" Within seconds of entering the Capitol, McGrew struck a MPD officer with his left hand and continued up the stairs. McGrew screamed at police officers and refused to follow instructions to leave the building. McGrew also struck several more officers, attempted to and successfully grabbed officers' batons, and locked arms with other rioters, in defiance of officers' commands that rioters leave the building. After leaving the Capitol, McGrew launched a metal pole at officers trying to prevent rioters from entering the Capitol through the tunnel entrance. McGrew had a lengthy criminal history, where probation calculated his criminal history category as V and faced a guideline range of 70 to 87 months of incarceration. The Court sentenced McGrew to 78 months' incarceration. Like McGrew, the Valentin brothers committed multiple violent assaults against police over the course of several hours, yelled at police, and only left Capitol grounds when police cleared the area. The Valentins' conduct warrants lower sentences because of their lower criminal history category.

## VII. RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary

authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[7] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The one identified victim in this case, Officer K.P., did not suffer bodily injury as a result of Andrew Valentin's assault. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that both Andrew and Matthew Valentin must pay $2,000 in restitution, which reflects in part the role they played in the riot on January 6.[8] M.V. Plea Agreement at ¶ 12; A.V. Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of

---

[7] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[8] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

July 2023. *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) The Valentin brothers' restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* M.V. PSR ¶ 146; A.V. PSR ¶ 149.

## VIII.   FINE

Matthew Valentin convictions for two violations of 18 U.S.C. ¶ 111(a)(1) subject him to a statutory maximum fine of $250,000 for each count of conviction. Similarly, Andrew Valentin's convictions for one violation of 18 U.S.C. ¶ 111(a)(1) and one violation of 18 U.S.C. ¶ 111(a)(1), (b), subject him to a statutory maximum fine of $250,000 for each count of conviction. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023).

The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, neither defendant has shown an inability to pay, thus pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e). M.V. PSR ¶ 122 ("He appears to be able to pay a fine in this case, in addition to restitution."); A.V. PSR

¶ 124 (noting that the defendant "appears to be able to pay a nominal fine in this case, in addition to restitution"). The guidelines fine range for Matthew Valentin is $10,000 - $100,000. U.S.S.G. § 5E1.2(c); M.V. PSR ¶ 128. The guidelines fine range for Andrew Valentin is $20,000 - $200,000. U.S.S.G. § 5E1.2(c); A.V. PSR ¶ 130.

## IX.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 57 months' imprisonment (an upward variance from his Guidelines range) for Matthew Valentin and a sentence of 57 months' imprisonment (the midpoint of his Guidelines range) for Andrew Valentin. The government further requests that this Court sentence both Matthew and Andrew Valentin to a three-year term of supervised release, $2,000 in restitution, and a mandatory assessment of $200.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:        /s/ Anna Z. Krasinski
ANNA Z. KRASINSKI
Assistant United States Attorney
New Hampshire Bar No. 276778
United States Attorney's Office
Detailed from the District of New
Hampshire
(603) 451-7851
anna.krasinski@usdoj.gov